JUSTICE MORRIS
delivered the Opinion of the Court.
¶1 Sunburst School District No. 2 and approximately ninety adjoining private property owners (collectively Sunburst) sued Texaco Inc. (Texaco) for damages caused by the migration of benzene onto their properties from Texaco’s neighboring refinery. Texaco appeals from a judgment in the Eighth Judicial District, Cascade County, following a jury trial. We affirm in part, reverse in part, and remand for further proceedings.
¶2 Texaco raises numerous issues, but we need address only the following to resolve this matter:
¶3 1. Whether an award of restoration damages for an injury to real
property may exceed the pre-tort market value of the damaged property.
¶4 2. Whether the Comprehensive Environmental Cleanup and Responsibility Act (CECRA) preempts a common law action for restoration damages.
¶5 3. Whether the District Court properly instructed the jury to award monetary damages, pursuant to Article II, Section 3, of the Montana Constitution, for any alleged constitutional tort committed by Texaco.
¶6 4. Whether the District Court’s exclusion of Texaco’s expert testimony constituted the proper remedy for Texaco’s failure to comply with the court’s scheduling order and M. R. Civ. P. 26(b)(4)(A)(i).
¶7 5. Whether the District Court properly excluded evidence of Texaco’s negotiations with the Department of Environmental Quality regarding remediation measures.
¶8 6. Whether Sunburst established that Texaco acted with actual fraud or actual malice as required by § 27-1-221, MCA, to support a punitive damages award.
*264 ¶9 7. Whether the private attorney general doctrine supports the District Court’s award of Sunburst’s attorney’s fees.
FACTUAL AND PROCEDURAL BACKGROUND
¶10 Texaco operated a gasoline refinery just outside the town of Sunburst, Montana, from 1924 until 1961. Gasoline leaked from pipes at the refinery for many years and contaminated the surrounding soil. The gasoline spread to the subsurface groundwater and eventually migrated underneath the town of Sunburst. The contamination came to Texaco’s attention as early as 1955 when escaping fumes from the underground plume caused a house in the town of Sunburst to explode. The accident prompted Texaco to conduct a partial cleanup of the contamination in the soil and groundwater. Texaco extracted some gasoline over the next few years, but left a significant amount of pollution.
¶11 Texaco notified the Environmental Protection Agency (EPA) in 1981 that potentially hazardous substances still might be present at the refinery site. EPA contractors conducted a site investigation in 1985 that revealed contamination of the soils and surface water in and around the refinery. Montana’s Department of Environmental Quality (DEQ) eventually assumed jurisdiction over the site pursuant to the terms of the CECRA, §§ 75-10-705 through 728, MCA. The continued presence of pollution caused Texaco to enter into a Consent Order with DEQ in 1989. The Consent Order required Texaco to investigate the pollution in order to develop and implement a remediation plan pursuant to CECRA.
¶12 Texaco completed a study of the groundwater beneath the town of Sunburst in 1991. The study revealed that the groundwater remained contaminated with benzene, a well-known carcinogen. The contamination did not violate any existing standards as Montana had not yet adopted benzene regulations for groundwater. Texaco hired TRC Environmental Consultants, Inc. (TRC) to conduct tests of the benzene levels in homes above the contamination plume. TRC’s test results indicated that “no volatile organic vapors were detected in excess of the Montana Department of Environmental Quality (MDEQ) action levels and no further action was required by MDEQ.” MDEQ concluded in January 1994 — based on the 1991 study by TRC-that “no exposure pathway and therefore no significant risk to the residents existed at the site for the impacted groundwater and no further groundwater investigations or remedial action was warranted.”
¶13 DEQ promulgated new regulations for groundwater in 1995. See *265 Admin. R. M. 17.30.1003. DEQ based the groundwater regulation for benzene on an excess lifetime cancer risk level, assuming continuous lifetime exposure, not to exceed one in one-hundred thousand. DEQ adopted a value for benzene of 0.005 mg/1, the same number used by the U.S. Environmental Protection Agency.
¶14 Data from the tests conducted by TRC in 1990 as part of the remedial investigation indicated that the groundwater from at least one sampling well in the town of Sunburst exceeded the new DEQ regulation for benzene. A resampling of the well in 1998 demonstrated that the groundwater continued to have benzene levels in excess of the DEQ regulations, thereby causing Texaco to be in violation of CECRA. See Admin. R. M. 17.38.204. Texaco sought a waiver from DEQ with regard to the new groundwater regulation. DEQ denied Texaco’s waiver request.
¶15 Texaco conducted no further remediation activities until 1999 when it entered into an investigative work plan with DEQ to examine the groundwater conditions. Texaco hired an environmental contractor, Tri-Hydro, Inc. (Tri-Hydro), to investigate the groundwater and to evaluate remediation alternatives. Following the completion of Tri-Hydro’s investigation, Texaco proposed to DEQ in May 2003 that it remediate the groundwater contamination through monitored natural attenuation (MNA).
¶16 MNA involves simply monitoring the level of benzene in the groundwater with the expectation that the environment naturally will degrade the benzene over a period of years. Opinions on the degradation period for benzene through MNA ranged from 20 to 100 years to reach contamination levels below the maximum level allowed by the DEQ regulations. Texaco selected MNA as its proposed remediation method based, in part, upon its cost effectiveness. TriHydro estimated that MNA would cost approximately $1 million compared with active remediation plans identified by Tri-Hydro that potentially could cost over $30 million. In 2003, DEQ proposed, for public comment, that Texaco use MNA to conduct the remediation.
¶17 DEQ released information to the public regarding contamination levels in both June 2001 and May 2003. Texaco also presented information to the public concerning the contamination and its proposed remediation method. Texaco’s presentation included a map that it had constructed of the contamination plume. At trial, Sunburst alleged that Texaco’s map selectively ignored unfavorable data.
¶18 Texaco distributed a newsletter to Sunburst residents in 2001, touting the effectiveness of MNA. The newsletter claimed that benzene *266 levels already had declined dramatically as a result of natural degradation. The newsletter contained a graph that purported to show the benzene levels of the highly-polluted well, identified by the earlier TRC studies, as decreasing over time. Sunburst alleged at trial that Texaco had omitted important data from the graph, however, and substituted data from a separate, less contaminated well, to create the false impression that the benzene level in the groundwater had been declining.
¶19 Sunburst filed this action against Texaco on February 22, 2001. Sunburst alleged numerous causes of action, including trespass, strict liability for abnormally dangerous activity, public nuisance, violation of the constitutional right to a clean and healthful environment, wrongful occupation of property, and constructive fraud. The District Court held a scheduling conference in October of 2003. The court’s subsequent scheduling order required the parties to disclose their expert witnesses and any “information required by Rule 26(b)(4)(A)(i), M. R. Civ. P.” on March 26,2004. The parties later stipulated to extend the deadline for expert disclosure to May 11, 2004.
¶20 Texaco listed sixty-seven expert witnesses and referenced documents that were not attached to its disclosure. The disclosure instead referred to documents that were contained in 50,000 pages of files that Texaco had provided in discovery. Sunburst moved to strike Texaco’s expert witnesses based upon Texaco’s failure to comply with M. R. Civ. P. 26(b)(4)(A)(i). Sunburst alleged that Texaco intended to overwhelm Sunburst’s counsel by failing to provide qualifications for many of the sixty-seven listed experts and by failing to specify the facts and opinions upon which many of the experts would testify.
¶21 Texaco argued that Rule 26(b)(4), did not require it to submit expert witness reports for experts who were not retained specifically for litigation. Several of Texaco’s proposed experts were Tri-Hydro employees. Texaco originally had retained Tri-Hydro to conduct an investigation at the site pursuant to the terms of the Consent Order that Texaco had entered with DEQ. The District Court deferred until trial any ruling on Sunburst’s motion.
¶22 Sunburst also filed a motion in limine to prevent Texaco from introducing evidence of DEQ’s role in the remediation process at the site. Sunburst contended that evidence of DEQ’s role would serve only to confuse the jury because CECRA constrained DEQ’s role to enforcing the health-based standards contained in the statute and imposed considerations on DEQ regarding the cost effectiveness of a cleanup plan. The court again deferred ruling until trial.
*267 ¶23 The District Court held a three-week jury trial from July 26,2004, to August 18,2004. On July 30th, just before opening statements, the court granted Sunburst’s motion to exclude any evidence of DEQ’s role in the remediation process. The court also sustained Sunburst’s objections to the testimony of several of Texaco’s expert witnesses on the grounds that Texaco had not adequately disclosed the basis for these witnesses’ expert opinions. At the conclusion of the evidence, the court found Texaco to be strictly liable to Sunburst, as a matter of law, for conducting an abnormally dangerous activity. The court found that Texaco’s liability for trespass extended to all the Sunburst plaintiffs who owned property above the contamination plume. As a result, the court instructed the jury to determine the amount of damages to award to all of the Sunburst plaintiffs who owned property above the plume, including the reasonable costs of environmental investigation, the cost of any future environmental investigation, and damages for the loss of use and enjoyment of Sunburst’s properties. The court also instructed the jury to award all costs that reasonably would be necessary to restore the plaintiffs’ property to the condition it would have been absent Texaco’s contamination. Finally, the court instructed the jury to award damages if Texaco had violated Sunburst’s constitutional right to a clean and healthful environment.
¶24 The jury awarded Sunburst compensatory damages of approximately $16 million. The jury’s special verdict included awards of $170,000 for wrongful occupation of property, $371,000 for constructive fraud, $350,000 for the costs of environmental investigation, and a single award of $226,500 for private nuisance, public nuisance and constitutional tort. The jury specified the amount awarded to each individual plaintiff for wrongful occupation and constructive fraud, but combined the award for private nuisance, public nuisance, and constitutional tort.
¶25 Sunburst requested a lump sum award for restoration because they argued cleanup represented a single expense that could not be apportioned among the plaintiffs. Sunburst maintained that they actually intended to use any award of restoration costs to remediate the property, rather than to divide any award among the plaintiffs. The jury awarded a lump sum of $15 million for restoration damages. ¶26 The jury also found Texaco had acted with actual fraud or actual malice and therefore was liable for punitive damages. Following the jury’s verdict, the District Court held a separate hearing to calculate the amount of punitive damages to be awarded. Texaco submitted a proposed jury instruction for the punitive damages phase that directed *268 the jury to consider whether its actions comported with state regulations or had been approved by a state regulator. The court denied the instruction, reasoning that it was “the same issue” that the court earlier had decided regarding the admissibility of evidence concerning DEQ. The jury awarded Sunburst $25 million in punitive damages.
¶27 Sunburst filed a post-trial motion for attorney’s fees and costs based upon the fact that the plaintiffs had acted as private attorneys general in vindicating an important constitutional right. The District Court determined that Sunburst could recover attorney’s fees, but did not settle on an amount. This appeal followed.
DISCUSSION
(1) Restoration Damages
¶28 The District Court instructed the jury to award all costs that reasonably would be necessary to restore the plaintiffs’ properties to the condition they would have been absent Texaco’s contamination. Whether restoration damages may be awarded in excess of a property’s market value constitutes a question of law. We conduct a plenary review of a district court’s conclusions of law to determine whether the court’s conclusions are correct. In re Conservatorship of Kloss, 2005 MT 39, ¶ 7, 326 Mont. 117, ¶ 7, 109 P.3d 205, ¶ 7.
¶29 Texaco cites Spackman v. Ralph M. Parsons Co., 147 Mont. 500, 414 P.2d 918 (1966), to support its claim that restoration damages never can exceed a property’s market value. Texaco fails to note, however, that Spackman dealt with readily replaceable items of personal property with an established market value. Bos v. Dolajak, 167 Mont. 1, 8, 534 P.2d 1258, 1261 (1975). In Bos, the Court rejected the defendant’s claim that damages should be limited to the price that the plaintiff had paid for a used silo plus the salvage value of the used silo after being damaged in a windstorm. The Court upheld the jury’s verdict that included a damage award of the replacement cost of the silo in order to satisfy the “basic objective of making the injured party whole.” Bos, 167 Mont. at 6, 534 P.2d at 1260. In Chandler v. Madsen, 197 Mont. 234, 242, 642 P.2d 1028, 1033 (1982), we rejected the notion from Spackman that a property’s market value constitutes “a hard- and-fast rule” for determining the proper amount of damages. There we upheld a jury’s award for the costs of repairing a house damaged by subsidence that exceeded the market value of the property. Chandler, 197 Mont. at 243-44, 642 P.2d at 1033-34.
*269 ¶30 As a result, we look first to the guidelines for the calculation of damages in cases involving injuries to real property in Burk Ranches, Inc. v. State, 242 Mont. 300, 790 P.2d 443 (1990). The difference between the value of the property before and after the injury, or the diminution in value, generally constitutes the appropriate measure of damages. We recognized, however, that “no single measure of damages can serve in every case to adequately compensate an injured party....” Burk Ranches, 242 Mont. at 305, 790 P.2d at 445-46.
¶31 Restoration costs may be awarded if an injury is temporary. Burk Ranches, 242 Mont. at 307, 790 P.2d at 447. A temporary injury may be abated or discontinued at any time, either by the act of the wrongdoer, or by the injured party. Burk Ranches, 242 Mont. at 306, 790 P.2d at 447. The ability to repair an injury must be more than a theoretical possibility in order for an injury to be temporary. Burk Ranches, 242 Mont. at 306, 790 P.2d at 447. A presumption exists that when restoration costs exceed the market value of a property, the injuries are considered permanent and the diminution in value rule applies. Burk Ranches, 242 Mont. at 307, 790 P.2d at 447. The presumption of permanence can be overcome, however, “by statutory and common laws, such as environmental laws, which compel repair or replacement.” Burk Ranches, 242 Mont. at 307, n. 3, 790 P.2d at 447, n. 3. Sunburst contends that the common law compels an award of restoration damages and urges us to adopt the Restatement (Second) of Torts § 929 for the calculation of damages for injuries to real property. Texaco argues that the District Court improperly directed the jury to award restoration damages in a manner that resulted in a jury award in excess of the total market value of Sunburst’s combined properties.
Reasons Personal Exception to Diminution in Market Value
¶32 The law of torts “attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.” Restatement (Second) of Torts § 901 cmt. a (1997); Butler v. Germann, 251 Mont. 107, 110, 822 P.2d 1067, 1069 (1991). Section 929 cmt. b provides that restoration damages may be appropriate in cases where “a building, such as a homestead is used for a purpose personal to the owner ....” The Restatement explains that restoration damages may be recoverable “even though this might be greater than the entire value of the building.” Restatement (Second) of Torts, § 929 cmt. b. The flexible guidelines of the Restatement (Second) of Torts, § 929, and comment b, allow a district court to craft an appropriate remedy for an injury to real property that restores a plaintiff as nearly as possible to *270 the “state the party would have attained had the [wrong] not occurred.” Butler, 251 Mont. at 110, 822 P.2d at 1069.
¶33 Restoration awards may compensate a plaintiff more effectively than diminution in value under certain circumstances. For example, when the damaged property serves as a private residence and the plaintiff has an interest in having the property restored, diminution in value will not return the plaintiff to the same position as before the tort. See Weld County Bd. of County Com’rs v. Slovek, 723 P.2d 1309, 1314 (Colo. 1986); see also Fowler Trust v. City of Boulder, 17 P.3d 797, 805 (Colo. 2001). In Slovek, a flood caused by a neighbor deposited silt and debris over a large portion of the plaintiffs land and damaged a fishing pond and a dike on the property. Slovek, 723 P.2d at 1311. The plaintiff requested an award to cover the costs to repair the damages to the land and restore the pond. The court relied upon § 929 in approving an award of restoration damages. Slovek, 723 P.2d at 1314-15. The court recognized that “the goal in compensating the property owner is to reimburse that owner for the actual loss suffered.” Slovek, 723 P.2d at 1314.
¶34 If a plaintiff wants to use the damaged property, instead of selling it, restoration of the property constitutes the only remedy that affords a plaintiff full compensation. Roman Catholic Church v. Louisiana Gas, 618 So.2d 874, 877 (La. 1993). In Roman Catholic Church, the Archdiocese of New Orleans (Archdiocese) purchased a low-income housing complex without a public bid from the Department of Housing and Urban Development (HUD) for $1.7 million in order to provide housing for poor families affiliated with its church. Roman Catholic Church, 618 So.2d at 875. As a condition of the Archdiocese’s purchase, HUD required the Archdiocese to maintain the complex for low-income rentals or the property would revert back to HUD. Roman Catholic Church, 618 So.2d at 875. A gas leak caused a fire that damaged the complex. Roman Catholic Church, 618 So.2d at 875.
¶35 The Archdiocese brought an action for damages against the supplier of natural gas to the complex. Roman Catholic Church, 618 So.2d at 875. The gas supplier admitted liability, but argued that damages should be limited to the diminution in value of the property. Roman Catholic Church, 618 So.2d at 875-76. The Louisiana Supreme Court recognized that limiting repair costs to diminution in value would force an innocent landowner either to sell property he wanted to keep or to make repairs out of his own pocket. Roman Catholic Church, 618 So.2d at 877. The court concluded that restoration damages were appropriate pursuant to § 929 because the Archdiocese *271 had reasons personal-to provide housing for its low income parishioners — to support restoration. Roman Catholic Church, 618 So.2d at 880. The court explained that when considering an award of damages “it is important to know how the property is used and what interest in it is asserted, so that the measure can be adopted that will afford compensation for any legitimate use that the owner makes of his property.” Roman Catholic Church, 618 So.2d at 880; see also Rector, etc. v. C. S. McCrossan, 235 N.W.2d 609 (Minn. 1975) (holding that replacement costs should be considered when the owner has reasons personal for the restoration).
¶36 We have adopted other sections of the Restatement (Second) of Torts. See, e.g., Crisafulli v. Bass, 2001 MT 316, ¶ 23, 308 Mont. 40, ¶ 23, 38 P.3d 842, ¶ 23 (adopting § 316, which imposes liability on a parent for the acts of a child in limited circumstances); Brandenburger v. Toyota Motor Sales, U.S.A. Inc., 162 Mont. 506, 513 P.2d 268 (1973), (adopting the language of § 402A imposing strict liability on the seller of defective products); First Bank (N.A.)-Billings v. Clark, 236 Mont. 195, 206, 771 P.2d 84, 91 (1989) (adopting § 46, comment j, relating to the tort of emotional distress). We now join other jurisdictions in adopting the flexible guidelines of the Restatement (Second) of Torts § 929, and comment b, for the calculation of damages to real property to ensure that plaintiffs receive a proper remedy for their injuries.
¶37 It is clear that the market value of land will not always correspond directly to a plaintiffs damages resulting from an injury to real property, thus rendering diminution in market value an inadequate measure of the property’s worth to the owner. Other courts have acknowledged that “the loss in market value is a poor gauge of damage” when the property gains its principal value from personal use rather than for pecuniary gain. Matich v. Gerdes, 550 N.E.2d 622, 626 (Ill. App. 4 Dist. 1990). Similarly, a nonprofit, charitable, or religious organization may place a high value on a particular parcel of real property that the market might not reflect. Roman Catholic Church, 618 So.2d at 879-80; Trinity Church v. John Hancock Mut. Life Ins. Co., 502 N.E.2d 532, 535-36 (Mass. 1987). Our adoption of § 929, and comment b, reflects the need for a flexible measure of damages to compensate adequately an injured property owner.
¶38 We agree with Sunburst that an award of restoration damages must be available to compensate a plaintiff fully for damages to real property when diminution in value fails to provide an adequate remedy. See, e.g., Anderson v. Bauer, 681 P.2d 1316 (Wyo. 1984) (recognizing restoration damages under the reasons personal exception *272 to § 929). Sunburst has demonstrated in this case that the diminution in market value approach fails to provide adequate compensation. Sunburst brought an action for contamination of the plaintiffs’ personal residences with benzene, a well-known carcinogen. A personal residence represents the type of property in which the owner possesses a personal reason for repair. Restatement (Second) of Torts § 929. The court in Slovek, 723 P.2d at 1314, recognized that the personal reasons for repair are usually the owner’s desire to enjoy and live in their homes. These reasons prove compelling and we adopt them as part of our analysis under Montana law.
¶39 One plaintiff, Sunburst School District, owns property that does not constitute a personal residence. The Sunburst School District operates a public school on the property. We still deem an award of restoration damages to be appropriate, however, in light of the fact that the responsible party could not remediate the groundwater beneath the personal residences owned by the other plaintiffs without also treating the groundwater beneath the school. The presence of the district as a collateral beneficiary does not defeat an award of restoration damages. Cf. Roman Catholic Church, 618 So.2d at 880 (church deemed to be appropriate beneficiary of restoration damages).
Concern Over Unreasonable Windfall
¶40 Texaco argues that any award of restoration damages that exceeds the market value of real property would result in a windfall for Sunburst as nothing requires the plaintiffs to use these funds to repair their properties. An “injured party is to be made as nearly whole as possible-but not to realize a profit. Compensatory damages are designed to compensate the injured party for actual loss or injury-no more, no less.” Burk Ranches, 242 Mont. at 307.
¶41 In Orndorff v. Christiana Community Builders, 217 Cal. App. 3d 683, 266 Cal. Rptr. 193 (Cal. App. 4th Dist. 1990), the evidence indicated that the costs of repairing a house constructed on uncompacted fill material likely exceeded the post-restoration value of the property. The court nevertheless accepted the uncontradicted testimony of the homeowners that they intended to repair their property. Orndorff, 217 Cal. App. 3d at 689, 266 Cal. Rptr. at 196. The owners had lived in the house for eleven years and testified that they had no intention of moving. Orndorff, 217 Cal. App. 3d at 689, 266 Cal. Rptr. at 196. The court determined that the injured property owners were not required to make any further showing to obtain their reasonable repair costs. Orndorff, 217 Cal. App. 3d at 689, 266 Cal. Rptr. at 196; see also Keitges v. VanDermeulen, 483 N.W.2d 137 (Neb. *273 1992) (holding that evidence of an owner’s intent was relevant to an award of restoration damages).
¶42 Similarly, in Heninger v. Dunn, 101 Cal. App. 3d 858, 162 Cal. Rptr. 104 (1980), the court upheld an award of restoration damages even though the wrongful act of bulldozing a road and destroying a tree actually had increased the fair market value of the property. The court relied on the owner’s testimony that “the land is beautiful” and he would “like to see it remain that way.” Heninger, 101 Cal. App. 3d at 866, 162 Cal. Rptr. at 109. The court deemed these statements sufficient evidence of reasons personal to support the award. Heninger, 101 Cal. App. 3d at 866, 162 Cal. Rptr. at 109. The court in Denoyer v. Lamb, 490 N.E.2d 615, 618 (Ohio App. 1984), agreed: “[W]hen the owner intends to use the property for a residence or for recreation or for both, according to his personal tastes and wishes, the owner is not limited to diminution in value....” Cf. Braun v. Agri-Systems, 2006 U.S. Dist. LEXIS 29947 (E.D. Cal. May 16, 2006) (rejecting that the cost of repairs was the appropriate measure of damages due to the fact that the owner already had sold the damaged property and could not make repairs).
¶43 We agree with these courts that evidence that an award of restoration damages actually will be used to repair the damaged property could overcome the general rule in favor of diminution in value as the appropriate measure of damages. The record in this case indicates that Sunburst actually will use the award of restoration damages to remediate the groundwater contamination. For example, the special verdict form presented to the jury provided for a single lump sum to be awarded for restoration damages. In presenting the special verdict form, Sunburst explained that a lump sum restoration award “attacks the problem as a whole, and the cleanup is a single expense, and damages cannot be divided between the plaintiffs ....”
¶44 Plaintiff Larry Linnell, when asked what he wanted accomplished in this lawsuit, testified that the “first and foremost thing that I want to see done is that the area gets cleaned up ....” Plaintiff Bradley Haugen testified that he joined the lawsuit against Texaco in order to “leave Sunburst in a much better position than it is now so that other people can live there without danger or worry.” Texaco did not refute these claims on cross-examination and did not present any evidence or testimony of its own to contradict Sunburst’s testimony. In light of the special verdict form, Sunburst’s arguments in support of the form, and the uncontroverted testimony that Sunburst presented that they will use the restoration damages award *274 for remediation, we determine that the award of restoration damages in this case would not constitute an unreasonable windfall.
Reasonableness of Amount of Restoration Damages
¶45 Finally we assess the reasonableness of the jury’s award of $15 million in restoration damages compared to the value of the damaged property. As a general rule, courts have assessed the reasonableness of an award of restoration damages against the market value of the property before the damage. See, e.g., Dixon v. City of Phoenix, 845 P.2d 1107, 1117 (Ariz. App. Div. 1 1992) (holding that restoration damages must be reasonable in relation to the “damage inflicted”); Slovek, 723 P.2d at 1317 (holding that the cost of restoration must not be “wholly unreasonable” in relation to the pre-tort market value). Strictly capping the amount of restoration costs available to the pretort market value of the property, however, raises serious public policy concerns.
¶46 A strict cap on restoration damages would equip the tortfeasor with the equivalent of a private right of inverse condemnation, or a power akin to a private right of eminent domain. Eminent domain is the right of the State to take private property for public use. Section 70-30-101, MCA. A potential tortfeasor would have an incentive to disregard or discount risks of contamination or pollution to neighboring property owners. Instead, a potential tortfeasor, armed with a power akin to a private right of eminent domain, could undertake any dangerous activity content with the knowledge that the damages from any harm that it may cause to a neighboring property, regardless of the cost of remediating the harm, would be limited to the market value of the neighboring property.
¶47 Injured property owners, by contrast, would face a “take it or leave it” proposition: sell the homes that they do not want to leave or continue to live under an increased threat of exposure to toxic chemicals. Injured property owners in Montana should not be forced into such a Hobson’s choice. Private individuals and corporations have no inherent power to exercise eminent domain and their authority to condemn must derive from legislative grant. McCabe Pet. Corp. v. Ease, and Right-of-Way, 2004 MT 73, ¶ 8, 320 Mont. 384, ¶ 8, 87 P.3d 479, ¶ 8. The legislature has not granted this power to private tortfeasors in Montana and we decline to create it. See § 70-30-102, MCA (enumerating public uses).
¶48 A strict cap on restoration damages also would fail to provide an adequate remedy for an injury to the environment or a special purpose property. Areas with great ecological value may have little or *275 no commercial value. A strict cap on restoration damages would deny any meaningful remedy for the harm to such areas. The court in Com. of Puerto Rico v. SS Zoe Colocotroni, 628 F.2d 652, 673 (1st Cir. 1980), acknowledged this concern in refusing to limit restoration damages to diminution in value where an oil spill affected an environmentally-sensitive area with an alleged market value of $5,000 per acre. See also Nampa & Meridian Irr. Dist. v. Mussell, 72 P.3d 868 (Idaho 2003) (recognizing that the cost of repairing or restoring an irrigation ditch was an appropriate measure of damages as the easement had no value other than as a water conveyance). The court in SS Zoe Coloctroni recognized that a strict application of the diminution in value rule “would frustrate appropriate measures to restore or rehabilitate the environment.” SS Zoe Coloctroni, 628 F.2d at 673. Although the court there relied on a statute that allowed for the awarding of restoration damages, its rationale is relevant here.
¶49 The jury awarded Sunburst $15 million in restoration damages. Testimony at trial established that the properties located above the contamination plume have an aggregate market value of approximately $2 million. A strict cap on restoration damages applied to the Sunburst property barely would cover the cost of MNA, Texaco’s preferred remediation method, estimated at approximately $1 million. The costs of the active remediation plans identified by Texaco’s consultants could approach $30 million. The jury’s award of $15 million in restoration damages falls comfortably within these two extremes, and we deem it to be reasonable compensation. For these reasons and under these circumstances, we conclude that the District Court properly allowed the jury to make an award of restoration damages to Sunburst that exceeded the value of the damaged property.
(2) Preemption of Restoration Damages
¶50 Texaco next argues that CECRA preempts a common law action of the type pursued by Sunburst for trespass or wrongful occupation of property that seeks restoration damages. Texaco contends that an award of restoration damages would interfere with CECRA’s delegation to DEQ to determine the standard for cleanup and to determine any plan for remediation. See § 75-10-721, MCA. In this case, DEQ proposed, for public comment, MNA as an appropriate remediation method. Thus, Texaco maintains that Sunburst’s common law action would usurp DEQ’s authority by requiring a more active remediation plan.
¶51 We long have recognized common law actions for intentional trespass, Branstetter v. Beaumont Supper Club, Inc., 224 Mont. 20, 24, *276 727 P.2d 933, 935 (1986) (adopting the Restatement (Second) of Torts § 158’s definition of intentional trespass), and negligent trespass, Guenther v. Finley, 236 Mont. 422, 425, 769 P.2d 717, 719 (1989) (discussing the tort of reckless or negligent trespass and applying the Restatement (Second) of Torts § 165). We must address whether CECRA preempts an award of restoration damages for these actions. The common law applies in Montana whenever it does not conflict with a statute. See § 1-1-108, MCA; O'Fallon v. Farmers Ins. Exchange, 260 Mont. 233, 244, 859 P.2d 1008, 1015 (1993). A presumption exists against statutory preemption of common law claims. See Pritchard Petroleum Co. v. Farmers Co-Op. Oil & Sup. Co., 121 Mont. 1, 15, 190 P.2d 55, 63 (1948). A statute does not take away common law claims except to the extent that the statute expressly or by necessary implication declares. Pritchard Petroleum, 121 Mont. at 15, 190 P.2d at 63.
¶52 We addressed the issue of statutory preemption of common law claims in Brewington v. Employers Life Ins. Co., 1999 MT 312, 297 Mont. 243, 992 P.2d 237. In Brewington, the personal representative of a deceased worker’s estate brought a common law bad faith claim against the employer’s workers’ compensation insurer. Brewington, ¶¶ 6-8. The district court dismissed the claim on the grounds that the Unfair Trade Practices Act, specifically § 33-18-242, MCA, preempted the common law action. Brewington, ¶ 10. We limited statutory preemption of common law claims to those circumstances in which a direct conflict exists between the statute and the common law claim. Brewington, ¶¶ 14-19. Although § 33-18-242(3), MCA, sought to provide the sole remedy for breach of contract claims and for fraud claims, we noted thatthe statute referred exclusively to claims brought by an “insured” and made no mention of third-party claimants. Brewington, ¶ 14. We declined to expand the scope of § 33-18-242(3), MCA, to prohibit breach of contract claims by third-party claimants. Brewington, ¶ 14.
¶53 In this case, CECRA does not explicitly prohibit common law claims. Although CECRA provides for a private right of action, § 75-10-724, MCA, this provision differs markedly from the common law action for restoration damages that Sunburst pursued. CECRA’s private right of action focuses on a potentially responsible party bringing an action for contribution or declaratory relief against other potentially liable parties for the recovery of remediation costs. In fact, the legislature directed DEQ to “set up a collaborative process” to analyze the elimination of joint and several liability with respect to cleanup of *277 CECRA-covered facilities. 1995 Mont. Laws 3419. This collaborative process culminated in the legislature’s amendment of § 75-10-724, MCA, in 1997 to make available the contribution and declaratory relief actions for potentially liable parties. 1997 Mont. Laws 1930.
¶54 The private right of action provision contains no limitation on common law claims seeking remediation damages. Neither the private right of action contained in § 75-10-724, MCA, as originally enacted, nor the 1997 amendment, makes any mention of excluding any potential common law claims. We will not add to CECRA a prohibition against common law claims that seek to recover restoration damages where the legislature has declined to do so. Brewington, ¶ 14.
¶55 Texaco asserted at oral argument that CECRA also preempts common law claims by necessary implication in that Sunburst could have brought a private right of action pursuant to CECRA’s “voluntary cleanup” provision set forth in §§ 75-10-730 through 738, MCA. Under this provision, Sunburst would have been required to fund an extensive environmental assessment and propose a detailed voluntary cleanup plan that had been prepared by a qualified environmental professional. Sections 75-10-733(1), 734, MCA. Sunburst further would have been required to reimburse DEQ for any remedial action costs that DEQ incurred in the review and oversight of the proposed voluntary cleanup plan. Section 75-10-733(3), MCA.
¶56 Sunburst would have been required to undertake these expenses with no guarantee that DEQ would approve the proposed voluntary cleanup plan, and with no guarantee that DEQ would require Texaco to cover the cost of the voluntary cleanup plan. Section 75-10-736, MCA. Although Texaco itself spent millions of dollars and went through at least two private contractors before arriving at its preferred alternative of MNA, with its $1 million price tag, Texaco downplays the risk to Sunburst of having to cover these costs. Moreover, Texaco fails to explain by what authority DEQ would impose this extra burden on Texaco when Sunburst’s proposed voluntary cleanup plan likely would include remediation activities that would seek to reduce the contamination levels below CECRA’s health-based standards. As noted by Sunburst, CECRA’s health-based standards do not necessarily equate to the complete absence of any health risks. Section 75-5-301, MCA.
¶57 Finally, pursuant to § 75-10-733(2)(c), MCA, Sunburst would have been required to obtain Texaco’s written consent to implement the proposed voluntary cleanup plan. Texaco engaged in protracted negotiations with DEQ from the time that the parties first entered into *278 a Consent Decree in 1989 through DEQ’s authorization of MNA in 2003. The prospect of Texaco consenting to a more active remediation plan seems implausible in this context.
¶58 More importantly, § 75-10-732, MCA, provides the eligibility criteria for a voluntary cleanup of a CECRA-covered facility, such as Texaco’s refinery. The legislature amended this section in 1997. According to the amendment’s statement of intent, the legislature sought “to provide potentially liable persons the opportunity to take the necessary remedial action before the state takes action ....” 1997 Mont. Laws 3210 (emphasis added). In other words, the legislature intended that the statute would allow a potentially liable party the opportunity to act before the State compelled remediation. The legislature made no mention of its intent that an injured property owner would use this statute as a vehicle to compel more active remediation. We reject the notion that the legislature could have intended this statute to provide a vehicle for an injured property owner to pursue a more active remediation program. See § 1-2-102, MCA (the intention of the legislature is to be pursued in interpreting a statute).
¶59 Thus, we agree with Sunburst that CECRA’s focus on cost effectiveness and limits on health-based standards differ from the factors to be considered in assessing damages under the common law. Nothing in CECRA preempts a common law claim that seeks to recover restoration damages to remediate contamination beyond the statute’s health-based standards. We conclude that no conflict exists between DEQ’s supervisory role under CECRA and restoration damages awarded under the common law. We further conclude that nothing in CECRA precludes a common law claim by necessary implication.
(3) Constitutional Tort
¶60 Texaco challenges the District Court’s decision to instruct the jury to award monetary damages, pursuant to Article II, Section 3, of the Montana Constitution, for any alleged constitutional tort. The availability of a cause of action presents a question of law that we review to determine if it is correct. Dorwart v. Caraway, 2002 MT 240, ¶ 29, 312 Mont. 1, ¶ 29, 58 P.3d 128, ¶ 29.
¶61 The Montana Constitution provides that all persons have a “right to a clean and healthful environment.” Art. II, Sect. 3, Mont. Const. The right to a clean and healthful environment constitutes a fundamental right. MEIC v. Dept. of Environmental Quality, 1999 MT 248, ¶ 63, 296 Mont. 207, ¶ 63, 988 P.2d 1236, ¶ 63. Texaco argues, however, that Article II, Section 3, cannot support a private cause of *279 action for monetary damages as it is not “self-executing.” As a result, Texaco contends that “the Montana Constitution places responsibility for environmental remedies squarely in the hands of the Legislature.” Texaco asserts that CECRA serves as the Legislature’s adopted remedy for environmental violations.
¶62 Sunburst points to our decision in Dorwart, ¶ 43, to support its claim that a private party must be able to bring an action seeking monetary damages against another private party for a violation in order to vindicate a fundamental constitutional right. The parties fully briefed this question and presented oral argument to the Court. In fact, we expressly framed the issues to be presented at oral argument to include whether “the right to a clean and healthful environment, Article II, Section 3, Constitution of Montana, is self-executing?” This Court repeatedly has recognized, however, that courts should avoid constitutional issues whenever possible. The Trust v. Yellowstone County, 2002 MT 201, ¶ 24, 311 Mont. 194, ¶ 24, 53 P.3d 1268, ¶ 24. We deem it possible in light of our decision in Dorwart to resolve this case without resort to determining whether Article II, Section 3, is self-executing and consequently could support a private cause of action for monetary damages.
¶63 The plaintiff in Dorwart brought an action against Stillwater County and several police officers stemming from an alleged illegal search and seizure. The plaintiff sought monetary damages based on alleged common law violations and alleged violations of Article II, Sections 10, 11, and 17 of the Montana Constitution. Dorwart, ¶ 16. We recognized that common law causes of action intended to regulate relationships among and between individuals may not always be adequate to redress the type of damage caused by the invasion of constitutional rights by government actors. Dorwart, ¶ 46. We noted that a police officer’s actions are likely to be more harmful than those resulting from the conduct of a private citizen. Dorwart, ¶ 43. We further reasoned that Article II, Section 16 of the Montana Constitution afforded speedy remedy for every injury of person, property, or character. Dorwart, ¶ 45. As a result, we held that recognition of a constitutional tort was necessary to provide citizens with an adequate remedy due to the fact that an injury inflicted by a government agent differs from the injury inflicted by a private individual. Dorwart, ¶ 46.
¶64 Thus we concluded in Dorwart that the absence of any other remedy supported the establishment of a constitutional tort. Dorwart, ¶ 46. We now have adopted Restatement (Second) of Torts § 929, to *280 allow for the recovery of restoration damages. See ¶36, supra. By their very nature, restoration damages would restore a private party back to the position that it occupied before the tort. An award of restoration damages serves to ensure a clean and healthful environment. Sunburst has not demonstrated that the common law restoration damages would not address adequately any potential damages caused by Texaco’s contamination. Accordingly, we conclude that the District Court erred in instructing the jury on the constitutional tort theory where, as here, adequate remedies exist under statutory or common law.
¶65 The special verdict form did not apportion the $226,500 award of damages between the constitutional tort and public nuisance, a circumstance that normally might require this Court to grant Texaco’s request that we remand the damages award to the District Court. See e.g., Little v. Grizzly Mfg., 195 Mont. 419, 427, 636 P.2d 839, 843 (1981). We note, however, that Texaco advocated that portion of the special verdict form that prevents us from resolving what part of the $226,500 damage award that the jury intended to attribute to the public nuisance claim.
¶66 Courts uphold a general verdict where substantial evidence supports any ground of recovery “in the absence of a pertinent objection to the charge or a request for a specific interrogatory.” Union Pacific Railroad Company v. Lumbert, 401 F.2d 699, 701 (10th Cir. 1968); see also Davis v. Rennie, 264 F.3d 86, 106 (1st Cir. 2001); Kossman v. Northeast Illinois Regional Commuter R.R., 211 F.3d 1031 (7th Cir. 2000); McCord v. Maguire, 873 F.2d 1271 (9th Cir. 1989). Texaco asked the District Court to submit a special verdict form to the jury that would have permitted the jury to enter only a single damage figure for all of the damages resulting from the combined claims of nuisance, public nuisance, and the constitutional tort once there was a “finding as to which tort was committed as to which plaintiff.” Texaco sought to combine the damages for all three torts in order to “delete any potential for overlap of damages.” Although the District Court denied Texaco’s proposed special verdict form, it submitted a special verdict form to the jury that reflected Texaco’s suggestion that the form permit only a single damages figure for the separate torts.
¶67 Texaco’s successful appeal of the constitutional tort instruction should not force a new trial on the damages attributable to the public nuisance when Texaco failed to object to — and in fact advocated-the submission of a special verdict form that combined the damages award for the various theories of liability. Lumbert, 401 F.2d at 701. Moreover, the record demonstrates that substantial evidence *281 at trial established that Texaco allowed gasoline and other substances to leak into the ground thereby creating an underground plume that contaminates the soil and groundwater under Sunburst’s properties. Substantial evidence presented to the jury also showed that the plume contains high levels of carcinogens, that it continues to expand, and that the properties located on the plume suffer ongoing harm from the presence and migration of the underground plume. Substantial evidence supports the jury’s $226,500 damage award based on the jury’s finding that Texaco created a public nuisance and thus we need not remand the damages award to the District Court. Lumbert, 401 F.2d at 701.
(4) Exclusion of Texaco’s Expert Testimony
¶68 Texaco challenges the District Court’s exclusion of testimony by its expert witnesses whom it disclosed pursuant to the court’s scheduling order. A district court possesses broad discretion in ruling on the admissibility of expert testimony, and without a showing of abuse of discretion, the district court's ruling will not be disturbed on appeal. State v. Vernes, 2006 MT 32, ¶ 14, 331 Mont. 129, ¶ 14, 130 P.3d 169, ¶ 14.
¶69 Texaco argues, in particular, that the District Court improperly excluded the expert testimony of three people employed by its environmental consultant, Tri-Hydro. Texaco also argues that the requirements of M. R. Civ. P. 26(b)(4)(A)(i) apply only to interrogatories. We disagree.
¶70 The District Court’s scheduling order required the parties to submit their expert witness disclosures in compliance with the requirements of Rule 26(b)(4)(A)(i), negating the need for either party to file interrogatories. Likewise, the spirit of our rules of civil procedure requires liberal disclosure on the part of all parties, including the disclosure of witnesses. Superior Enterprises v. Montana Power Co., 2002 MT 139, ¶ 18, 310 Mont. 198, ¶ 18, 49 P.3d 565, ¶ 18. Neither party filed separate interrogatories. The court did not intend for the parties to file separate interrogatories to demand expert witness disclosures. The court’s scheduling order in this case carried the same effect as would a party’s interrogatory requesting disclosure. See Nelson v. Nelson, 2005 MT 263, ¶¶ 31-34, 329 Mont. 85, ¶¶ 31-34, 122 P.3d 1196, ¶¶ 31-34; Seal v. Woodrows Pharmacy, 1999 MT 247, ¶ 23, 296 Mont. 197, ¶ 23, 988 P.2d 1230, ¶ 23.
¶71 Texaco nevertheless maintains that the court’s exclusion of its expert witnesses constituted too harsh of a remedy in light of the fact that Sunburst did not suffer any prejudice from Texaco’s inadequate *282 disclosures. Texaco claims that Sunburst already had deposed several of the Tri-Hydro witnesses and had ample opportunity to depose all the witnesses listed in its disclosure. Texaco provided a list of sixty-seven expert witnesses on May 12, 2004. Discovery closed on June 15, 2004, and the trial was set for July 26, 2004. Sunburst could not have deposed adequately all sixty-seven of Texaco’s listed expert witnesses in that limited time frame.
¶72 Even with respect to the Tri-Hydro employees whom Sunburst already had deposed, however, we cannot say that Sunburst did not suffer any prejudice. Texaco did not notify Sunburst of its intent to have these Tri-Hydro witnesses potentially provide Rule 702 testimony until Texaco disclosed them as experts. This disclosure took place after Sunburst had deposed the Tri-Hydro employees. Without such notice, the opportunity to depose does not remove the prejudice. Jenkins v. Whittaker Corp., 785 F.2d 720, 728, n. 20 (9th Cir. 1986). As noted by the commentary to the similar federal rule, “[t]he lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand.” Fed. R. Civ. P. 26(b)(4) advisory comm. nn. Sunburst could not anticipate the particular approach that Texaco’s proposed experts would take or the data on which they would rely without a full disclosure provided by Texaco, pursuant to M. R. Civ. P. 26(b)(4)(A)(i), and a reasonable opportunity to depose them after the disclosure. Jenkins, 785 F.2d at 728 n. 20.
¶73 We cannot say on these facts that the District Court’s decision to prohibit Texaco from introducing expert testimony for its failure to comply with the provision of the scheduling order regarding expert witness disclosures pursuant to M. R. Civ. P. 26(b)(4)(A)(i), rises to the level of an abuse of discretion. Vernes, ¶ 14. Accordingly, we affirm the District Court’s decision to prevent Texaco’s expert witnesses from testifying.
(51 Exclusion of Evidence Related to DEQ for Compensatory Damages
¶74 The District Court excluded from the trial any evidence of Texaco’s negotiations with DEQ over remediation alternatives. We review a district court’s evidentiary rulings to determine if the court abused its discretion. Finstad v. W.R. Grace & Co., 2000 MT 228, ¶ 43, 301 Mont. 240, ¶ 43, 8 P.3d 778, ¶ 43. A district court has broad discretion to determine the admissibility of evidence. Finstad, ¶ 43.
¶75 Texaco argues that DEQ’s oversight of the contamination and involvement in the selection of remediation alternatives constituted *283 highly relevant evidence in that it would have demonstrated to the jury that an independent party had monitored Texaco’s investigation, had concurred in its MNA remediation plan, and would have provided oversight to ensure that Texaco properly completed the remediation. The evidence that Texaco sought to introduce of DEQ’s role has no bearing, however, on Texaco’s conduct before federal and state regulators became involved at the Sunburst site.
¶76 Texaco presented offers of proof to the District Court with respect to three current or former DEQ employees-Carol Fox, Aimee Reynolds, and David Bowers. The offers of proof indicated that the excluded DEQ witnesses would have testified exclusively about Texaco’s negotiations with DEQ from the late 1980s through the filing of this action by Sunburst in 2003. The exhibits attached to Texaco’s offers of proof also reflect correspondence and interactions between Texaco and DEQ during this same period.
¶77 The District Court determined that Texaco was strictly liable for the harm stemming from Texaco’s operation of its refinery. Texaco did not appeal this determination. As a result, liability flowed to Texaco despite any attempts by it to minimize the harm or belatedly mitigate the contamination. The common law seeks to restore a party to the condition that existed before the injury. Burk Ranches, 242 Mont. at 307, 790 P.2d at 447. No benzene contamination existed in the groundwater before the injury. The contamination originated from Texaco’s refinery operations. Texaco ceased operating the refinery in 1961. The benzene had migrated to the groundwater beneath the town of Sunburst by that time as evidenced by the explosion that destroyed a house in 1955. The migration likely had been completed by 1990 when sampling wells operated by Texaco’s contractor, TRC, revealed elevated levels of benzene.
¶78 Evidence of Texaco’s affcer-the-fact negotiations with DEQ in the 1990s and the early 2000s to demonstrate its level of cooperation with state regulators after having caused the contamination would not change the scope of the damage or the cost of removing the contamination from the Sunburst property. Neither Texaco’s negotiations with DEQ nor its belated attempts to comply with CECRA would alter Texaco’s liability stemming from its conducting of an abnormally dangerous activity or the amount of harm suffered by Sunburst. Strict liability applies; accordingly, Texaco would be liable for Sunburst’s compensatory damages regardless of the care with which Texaco may or may not have conducted its refinery operations. Matkovic v. Shell Oil Co., 218 Mont. 156, 159, 707 P.2d 2, 4 (1985) *284 (adopting Restatement (Second) of Torts § 519). Texaco would be liable for compensatory damages regardless of the level of Texaco’s cooperation with DEQ more than thirty years after having caused the last of the contamination from its refinery. Matkovic, 218 Mont. at 159, 707 P.2d at 4.
¶79 Finally, the District Court determined that Texaco had failed to disclose adequately its expert witnesses as required by the court’s scheduling order. Texaco admits that this determination prevented it from offering any testimony by its experts at trial. We affirmed the court’s determination at ¶ 73, supra. Thus, it is unlikely that Texaco would have been able to solicit any testimony from their DEQ experts regardless of the correctness of the District Court’s decision to exclude the DEQ evidence based upon a lack of relevancy to Sunburst’s claims for compensatory damages.
¶80 We agree with the District Court that DEQ’s role in Texaco’s belated attempts to comply with CECRA would not be relevant to Sunburst’s claims to be made whole under the common law. We cannot say on this record that the District Court’s exclusion of evidence regarding DEQ’s role when determining Texaco’s liability for various common law claims rose to the level of an abuse of discretion. Finstad, ¶ 43.
(6) Exclusion of Evidence Relating to DEQ for Punitive Damages
¶81 Texaco contends that the District Court’s exclusion of evidence of DEQ’s role in the remediation process prevented it from introducing evidence bearing on its state of mind. Punitive damages may be awarded when a defendant has been found to have acted with actual fraud or actual malice. Section 27-1-221, MCA. The defendant’s state of mind represents a key element in determining whether a defendant acted with actual fraud or actual malice. A good-faith effort to comply with all government regulations “would be evidence of conduct inconsistent with the mental state requisite for punitive damages.” Silkwood v. Kerr-McGee Corp., 485 F.Supp. 566, 584(W.D. Okla. 1979).
¶82 The District Court’s order upholding the jury’s award of punitive damages included a number of findings of fact regarding misconduct by Texaco. The court noted, among other matters, that Texaco had been communicating with the public regarding the contamination since the late 1980s. The court found that Texaco’s communication with the public “consistently [has] minimized the problem and failed to accurately report their findings.” The court attributed this effort at minimization to the fact that Texaco was motivated by its “own financial interests.” In particular, the court referred to a 1989 *285 document outlining Texaco’s “hidden agenda” to save money at the expense of meaningful cleanup in Sunburst. The court farther attributed to Texaco “numerous affirmative misrepresentations concerning the pollution in Sunburst.” Finally, the court found that Texaco’s decision to rely upon MNA as its remediation alternative “was not scientifically supportable.”
¶83 We cite these findings, not to dispute their accuracy, but to point out that the District Court relied, at least in part, upon Texaco’s conduct, or more appropriately, its misconduct, since entering the Consent Decree with DEQ in 1989, in justifying the jury’s award of punitive damages. Despite partially relying on Texaco’s post-Consent Decree conduct in justifying the jury’s award of punitive damages, the District Court excluded evidence of Texaco’s negotiations with DEQ during this same time frame. The District Court determined that evidence of Texaco’s negotiations with DEQ likely would confuse the jury and divert its attention from evaluation of Sunburst’s common law claims. We agreed that evidence of Texaco’s negotiations with DEQ was not relevant to the issue of compensatory damages. ¶ 80, supra. We cannot agree, however, that this DEQ evidence would not be relevant to the issue of punitive damages.
¶84 A district court retains, and should use, authority under Mont. R. Evid. 403, to keep a trial within sensible bounds. A district court may not categorically exclude, however, evidence tending to show why the defendant acted as it did, or failed to act, whatever the case may be, when a jury considers whether to award punitive damages. See, e.g., Swinton v. Potomac Corp., 270 F.3d 794, 814-15 (9th Cir. 2001) (holding that trial court retains discretion to allow defendant to introduce evidence of remedial measures in response to its discovery of misconduct as a means to mitigate punitive damages). Such evidence bears on whether Texaco acted with “deliberate indifference,” whether Texaco knowingly concealed any material facts, and the size of any appropriate punitive award. For example, Texaco may be able to persuade a jury that its choice of MNA as a remediation alternative following negotiations with DEQ did not evince “deliberate indifference” to the rights and health of the property owners in Sunburst. As noted by the District Court, Sunburst has a strong argument that Texaco’s inaction and selection of the relatively cheap MNA remediation alternative indeed demonstrate “deliberate indifference,” but the debate should not be preempted by disabling Texaco from explaining itself. E.E.O.C. v. Indiana Bell Telephone Co., 256 F.3d 516, 528 (7th Cir. 2001).
*286 ¶85 We conclude that the District Court abused its discretion by prohibiting Texaco from introducing evidence at trial of DEQ’s involvement with the site remediation and Texaco’s attempted compliance with CECRA for purposes of considering the appropriateness of punitive damages. The District Court compounded this error when it refused to instruct the jury at the hearing on the amount of punitive damages to consider whether Texaco’s actions comported with state regulations or had been approved by a state regulator. We vacate the jury’s award of $25 million in punitive damages. The question of the appropriateness of punitive damages must be put again to a jury with Texaco being allowed to present evidence of DEQ’s role in the process.
¶86 Our decision raises the problem of how the District Court could have prevented the jury from hearing evidence of DEQ’s role for purposes of compensatory damages, but allowed the jury to hear evidence of DEQ’s role for purposes of determining the appropriateness of punitive damages. We need not resolve this dilemma, however, as the District Court excluded evidence of DEQ’s role for both purposes. We affirmed the District Court’s exclusion for purposes of compensatory damages. ¶ 80, supra. A new jury may consider evidence of DEQ’s role for purposes of determining whether Texaco acted wdth actual fraud or actual malice.
(7) Attorney’s Fees
¶87 Texaco attacks the District Court’s award of Sunburst’s attorney’s fees based on the private attorney general doctrine. We will not overturn a district court’s award of attorney's fees absent an abuse of discretion. See School Trust v. State ex rel. Bd. Of Com’rs, 1999 MT 263, ¶ 68, 296 Mont. 402, ¶ 68, 989 P.2d 800, ¶ 68 (MonTrust).
¶88 Montana adheres to the “American Rule” concerning attorney’s fees. Finke v. State ex rel. McGrath, 2003 MT 48, ¶ 30, 314 Mont. 314, ¶ 30, 65 P.3d 576, ¶ 30. The American Rule provides, generally, that a party in a civil action may not recover attorney’s fees absent a specific contractual or statutory provision. MonTrust, ¶ 62. This Court has recognized several equitable exceptions to the American Rule, including the private attorney general doctrine. MonTrust, ¶ 67.
¶89 The private attorney general doctrine “is normally utilized when the government, for some reason, fails to properly enforce interests which are significant to its citizens.” Matter of Dearborn Drainage Area, 240 Mont. 39, 43, 782 P.2d 898, 900 (1989). This Court considers three factors when determining whether attorney’s fees should be awarded under this doctrine: (1) the strength or societal *287 importance of the public policy vindicated by the litigation; (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff; and (3) the number of people standing to benefit from the decision. MonTrust, ¶ 67.
¶90 Sunburst maintains that their action vindicated an important public policy regarding the rights of property owners that will benefit all present and future residents of the town of Sunburst. Sunburst further contends that private enforcement proved necessary in light of DEQ’s inaction and that they undertook a significant financial burden litigating this case. Texaco responds that the State properly enforced the rights of the people of Sunburst by acting through DEQ. Texaco further notes that Sunburst had the opportunity to, and did, win a large judgment.
¶91 We agree with Texaco that the private attorney general doctrine provides an incentive for parties to bring public interest related litigation that might otherwise be too costly to bring. Flannery v. California Highway Patrol, 61 Cal. App. 4th 632, 635, 71 Cal. Rptr. 2d 632, 635 (Cal. App. Dist. 1998). The private attorney general doctrine “was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest.” Flannery, 61 Cal. App. 4th at 635, 71 Cal. Rptr. 2d at 636. Sunburst’s litigation here resulted in a multi-milliondollar judgment. Sunburst needed no additional incentive to file this lawsuit. The District Court abused its discretion by awarding Sunburst’s attorney’s fees under the private attorney general doctrine.
CONCLUSION
¶92 The District Court properly instructed the jury regarding its award of restoration damages in excess of the pre-tort market value of Sunburst’s property. CECRA does not preempt a common law action for restoration damages. The availability of restoration damages under the common law leads us to decline to resolve the issue of whether a constitutional tort for monetary damages exists pursuant to Article II, Section 3 of the Montana Constitution for damages caused by a private party. We decline to disturb the District Court’s orders prohibiting Texaco from introducing any expert testimony and excluding evidence relating to Texaco’s negotiations with DEQ with respect to compensatory damages. We set aside, however, the jury’s decision to award punitive damages and the jury’s $25 million award of punitive damages and remand for a new trial on this issue in light of the court’s erroneous decision to exclude the same information relating to DEQ. *288 These negotiations could have shed light on Texaco’s state of mind and correspondingly whether it acted with actual fraud or actual malice. Finally, we conclude that the possibility of a large damage award provided Sunburst with the necessary incentive to pursue this action to ameliorate its private rights without the extra incentive of a possible award of attorney’s fees.
¶93 We affirm in part, reverse in part, and remand for further proceedings.
JUSTICES LEAPHART, WARNER and RICE concur.