FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 16 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

DAVID BORDEN, individually, and on
behalf of all others similarly situated,

Plaintiff-Appellant,

v.

EFINANCIAL, LLC, a Washington Limited
Liability Company,

Defendant-Appellee.

No.  21-35746

D.C. No. 2:19-cv-01430-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted July 7, 2022
Portland, Oregon

Before:  Ryan D. Nelson and Kenneth K. Lee, Circuit Judges, and Jed S. Rakoff,[*]
District Judge.

Opinion by Judge Lee

---

[*]    The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

## SUMMARY[**]

### Telephone Consumer Protection Act

The panel affirmed the district court's dismissal of an action under the Telephone Consumer Protection Act, which prohibits marketers from using "autodialing" technology to call phone numbers en masse without the consent of the recipients.

The plaintiff alleged that defendant eFinancial, LLC, used a "sequential number generator" to pick the order in which to call customers who had provided their phone numbers. The panel held that an "automatic telephone dialing system" must generate and dial random or sequential *telephone* numbers under the TCPA's plain text. eFinancial thus did not use an autodialer, and its texts to the plaintiff did not implicate the TCPA.

### COUNSEL

Shawn A. Heller (argued), Social Justice Law Collective, Dunedin, Florida; Joshua A. Glickman, Social Justice Law Collective, Overland Park, Kansas; for Plaintiff-Appellant.

James G. Snell (argued), Perkins Coie LLP, Palo Alto, California, Nicola Menaldo and Anna M. Thompson, Perkins Coie LLP, Seattle, Washington; for Defendant-Appellee.

Alan J. Butler, Megan Iorio, and Christopher Frascella, Electronic Privacy Information Center, Washington, D.C., for Amicus Curiae Electronic Privacy Information Center.

Tara S. Morrissey and Jonathan D. Urick, United States Chamber Litigation Center, Washington, D.C.; Andrew J. Pincus, Archis A. Parasharami, and Daniel E. Jones, Mayer Brown LLP, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Jessica L. Ellsworth, Mark W. Brennan, Arpan A. Sura, and Johannah Walker, Hogan Lovells US LLP, Washington, D.C.; for Amicus Curiae ACA International.

Michele Shuster, Mac Murray & Shuster LLP, New Albany, Ohio, for Amicus Curiae Professional Association for Customer Engagement.

---

[**]     This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

LEE, Circuit Judge:

Being deluged with "spam" telemarketing phone calls or text messages is the bane of modern life. In a world where countless companies try to capture our attention, it can be exasperating to receive yet another ping on a smartphone. Back in 1991—when the equivalent of a "smartphone" was a brick-sized phone held by the likes of Gordon Gekko—Congress enacted the Telephone Consumer Protection Act ("TCPA"). One of the purposes of the TCPA was to prevent marketers from using "autodialing" technology to call phone numbers en masse.

Fast forward to today—and technology keeps evolving. After David Borden provided his phone number to an insurance company on a website, he began receiving marketing texts from eFinancial. Borden sued under the TCPA, claiming that eFinancial uses a "sequential number generator" to pick the order in which to call customers who had provided their phone numbers. He says that this type of number generator qualifies as an "automatic telephone dialing system" (often colloquially called an "autodialer") under the TCPA. But eFinancial responds that it does not use an autodialer. eFinancial argues that the TCPA defines an autodialer as one that must generate *telephone* numbers to dial, not just any number to decide which pre-selected phone numbers to call.

We hold that an "automatic telephone dialing system" must generate and dial random or sequential *telephone* numbers under the TCPA's plain text. The Supreme

2

Court's recent decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), supports that reading. eFinancial thus has not used an autodialer, and its texts to Borden do not implicate the TCPA. We thus affirm the district court's dismissal of the lawsuit.

## BACKGROUND

David Borden decided to shop online for life insurance by seeking out insurance quotes. He ended up on Progressive.com. To get an insurance quote, Borden had to provide his personal information on a webpage. Below the "Next, your rates" link on the website was a disclaimer in small, lighter text:

> By pressing the button above you agree to this website's Privacy Policy, and you consent to receive offers of insurance from Efinancial, LLC at the email address or telephone numbers you provided, including autodialed, pre-recorded calls, SMS or MMS messages. Message and data rates may apply. You recognize and understand that you are not required to sign this authorization in order to receive insurance services from eFinancial and you may instead reach us directly at (866) 912-2477.[1]

After clicking this link, Borden received various insurance policy options, but he ultimately decided not to purchase any insurance from the site.

---

[1] Borden claims that he did not knowingly consent to receive marketing messages from eFinancial because this disclosure was inadequate. Because we hold that eFinancial did not use an autodialer under the TCPA, we do not reach the question of consent.

Later, Borden began receiving marketing messages from eFinancial.  Borden was surprised and annoyed to receive these text messages because he thought they were spam and did not remember agreeing to receive them.

Borden alleges in his Second Amended Complaint that eFinancial used an autodialer to send him text messages.  He claims that eFinancial "used the sequential number generator to determine the order in which to pick the telephone numbers to be dialed from Defendant's stored list (database), such that each eFinancial Insurance Text Message Advertisement is sent in an adjustable but predetermined sequential order, which is based on the number of days since the lead form was initially completed ('eFinancial Mass Text Advertisement Sequential Order')."  He also claims that eFinancial's autodialer "also uses a sequential number generator to assemble sequential strings of numbers in a field labeled LeadID, which are then stored and assigned to a telephone number and are used when the sequential number generator picks the order, which is based on the adjustable but predetermined eFinancial Mass Text Advertisement Sequential Order."

Borden filed this class action against eFinancial, but the district court dismissed it, ruling that eFinancial did not use an autodialer.  This appeal followed.

## STANDARD OF REVIEW

This court reviews de novo the district court's decision to grant eFinancial's motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Outdoor Media Grp., Inc. v.*

4

*City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007).

## ANALYSIS

### I.    Borden Does Not Plausibly Allege eFinancial Used an Autodialer as Defined in the TCPA.

The TCPA generally makes it unlawful for anyone in the United States to make a call using an "automatic telephone dialing system" without the consent of the recipient. 47 U.S.C. § 227(b)(1)(A). But much litigation, including this case, surrounds the issue of what equipment qualifies as an "automatic telephone dialing system." Borden argues that an autodialer must merely generate some random or sequential number during its dialing process (for example, to figure out the order to call a list of phone numbers), and is not limited to generating telephone numbers. eFinancial argues that an autodialer must generate random or sequential telephone numbers to dial. Based on the TCPA's statutory text and the Supreme Court's recent decision in *Duguid*, we hold that an autodialer must randomly or sequentially generate *telephone* numbers, not just any number.

### A. The TCPA requires that an autodialer randomly or sequentially generate *telephone* numbers, not just any numbers.

The TCPA prohibits calling telephone numbers using an autodialer in certain cases. The TCPA defines an "automatic telephone dialing system" as:

> equipment which has the capacity—
>
> (A) to store or produce telephone numbers to be called, *using a random or sequential number generator*; and

(B) to dial such numbers.

47 U.S.C. § 227(a)(1) (emphasis added).  The statutory text makes clear that the number in "number generator" within subpart (A) means a *telephone* number.

First, the structure of the sentence suggests that "number generator" modifies "telephone numbers to be called."  When interpreting a modifying clause set off by commas, "the most natural way to view the modifier is as applying to the entire preceding clause."  *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1077 (2018).  Here, "to store or produce telephone numbers to be called" is dependent on the clause "using a random or sequential number generator."  This means that "using a random or sequential number generator" modifies the phrase "to store or produce telephone numbers to be called."  Thus, it makes the most sense that the "number" referred to in the modified clause is the same as the "numbers" in the dependent clause—both are referring to telephone numbers.

Second, the repeated use of "number" in the autodialer statutory definition makes clear, through context, that it must mean a telephone number.  The definition's first use of numbers is "telephone numbers."  47 U.S.C. § 227(a)(1)(A).  This sets the stage and provides context for the other uses.  The third and last time that the definition uses "numbers" is referential: it defines an autodialer as equipment with the capacity to dial "*such* numbers."  *Id.* § 227(a)(1)(B) (emphasis added). This invocation of numbers must mean telephone numbers because it would make no

6

sense to dial the randomly generated number if it were not a telephone number. The common understanding of the verb "to dial" in the context of a statute about phone calls is inputting telephone numbers into a phone to make a call. It would be illogical, or very poor legislative drafting, first explicitly to invoke phone numbers, then next to refer to other non-telephone numbers, and then finally to go back to phone numbers by calling them "such numbers." A word is interpreted in the context of the company it keeps. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). Presumably, Congress did not intend to create a confusion sandwich, and instead used the word "numbers" to mean telephone numbers throughout the definition.

Third, the TCPA uses both "telephone number" and "number" interchangeably throughout the statute to mean telephone number, suggesting that in the definition section all uses of "number" mean telephone number. For example, in the section on the Do-Not-Call Database, the statute first prohibits making a solicitation "to the telephone number of any subscriber included in such database." 47 U.S.C. § 227(c)(3)(F). Shortly after that, the statute explains that regulations of the database must "specify methods for protection of the privacy rights of persons whose numbers are included in such database." *Id.* § 227(c)(3)(K). This second subsection refers to telephone numbers because (much like it does not make sense to dial non-telephone numbers) it makes no sense that people would have non-telephone numbers that they would want placed in a Do-Not-Call Database.

And the statute again seems to use "number" as a shorthand for telephone number when defining "caller identification service." It defines that term as "any service or device designed to provide the user of the service or device with the telephone number of . . . a call . . . or text message." *Id.* § 227(e)(8)(B). It then clarifies that this "includes automatic number identification services." It must be that "automatic number identification services" means telephone number identification because it would make no sense otherwise.

In sum, the text and context of the statute make clear that an autodialer must be able to generate and dial random or sequential number phone numbers, not just any number.

### B. The Supreme Court's decision in *Duguid* reinforces that an autodialer must generate telephone numbers.

The Supreme Court's recent decision in *Duguid*, 141 S. Ct. 1163, underscores that an autodialer must randomly or sequentially generate and dial a telephone number.

To start, the Court explained that *Duguid* would "resolve a conflict among the Courts of Appeals regarding whether an autodialer must have the capacity to generate random or sequential *phone* numbers." *Id.* at 1168 (emphasis added). Before *Duguid*, some circuits held that equipment could qualify as an autodialer just because it autodialed stored phone numbers that had not been randomly or sequentially generated in the first instance. *See, e.g.*, *Marks v. Crunch San Diego,*

*LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018). But the Supreme Court rejected this interpretation. It held that "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called," *Duguid*, 141 S. Ct. at 1173, because the contrary interpretation "would capture virtually all modern cell phones, which have the capacity to store telephone numbers to be called and dial such numbers," *id.* at 1171 (quotation marks and citation omitted). Borden's interpretation would go against the Supreme Court's holding and return this circuit back to the pre-*Duguid* state in which "virtually all" cell phones were at risk of violating the TCPA.

The Court's discussion of the TCPA's policy aims also supports the view that an autodialer must be able to generate random or sequential telephone numbers. It noted that autodialers had "revolutionized telemarketing by allowing companies to dial random or sequential blocks of *telephone* numbers automatically." *Id.* at 1167 (emphasis added). Besides annoying consumers, the autodialer "threatened public safety by 'seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services.'" *Id.* (quoting H.R. Rep. No. 102-317, at 24 (1991)). And it could "simultaneously tie up all the lines of any business with sequentially numbered phone lines." *Id.*

But these concerns would not matter under Borden's interpretation of the TCPA. Using a random or sequential number generator to select from a pool of customer-provided phone numbers would not cause the harms contemplated by Congress. Public emergency services (such as police or fire departments) would presumably not be in these customer-provided lists. And if an autodialer called the phone numbers on its customer list sequentially, it would likely not reach the sequential numbers often assigned to a single business (e.g., when a business has many phone lines that share the same area code and the first 3-5 numbers of the telephone number). The Court's discussion of these risks would make no sense if the autodialer definition were not tailored to equipment capable of sequential or random generation of telephone numbers.

Borden's argument hinges on his interpretation of Footnote 7 in *Duguid*: he argues that it shows that an autodialer can generate a non-telephone number to determine the order in which to call telephone numbers from a premade list. The full text of Footnote 7 is:

> Duguid argues that such a device would necessarily "produce" numbers using the same generator technology, meaning "store or" in § 227(a)(1)(A) is superfluous. "It is no superfluity," however, for Congress to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 544, n. 7, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time. See Brief for Professional Association for Customer Engagement et al. as *Amici Curiae* 19. In any event, even if the storing and

10

producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute. *Atlantic Richfield Co.* v. *Christian*, 590 U. S. ——, ——, n. 5, 140 S.Ct. 1335, 1350, n. 5, 206 L.Ed.2d 516 (2020).

*Id.* at 1172 n.7. Borden seizes on this sentence: "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list." *Id.* He argues that this is exactly what eFinancial did.

But this is an acontextual reading of a snippet divorced from the context of the footnote and the entire opinion. *See, e.g.*, *Hufnus v. DoNotPay, Inc.*, 2021 WL 2585488, at *1 (N.D. Cal. June 24, 2021) (rejecting similar reading of *Duguid*'s footnote). Much like we do not interpret a statute by cherry-picking one word out of it, we should not pluck one sentence out of an opinion without looking at its context. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is a primary determinant of meaning . . . . The entirety of the document thus provides the context for each of its parts."). Borden's myopic focus on a single sentence in a footnote—hardly a holding—ignores the broader context discussed by the Court, including how the Court itself characterized the issue as "whether an autodialer must have the capacity to generate random or sequential *phone* numbers." *Duguid*, 141 S. Ct. at 1168 (emphasis added).

In reality, Footnote 7 merely addressed how an autodialer could both "store" and "produce" telephone numbers without rendering those two terms superfluous. The Court cited an amicus brief describing patents on technology that "used a

11

random number generator to store numbers to be called later (as opposed to using a number generator for immediate dialing)." *Id.* at 1172 n.7 (citing Brief for Professional Ass'n for Consumer Engagement et al. as *Amici Curiae* ("PACE *Duguid* Br.") at 15-21). As detailed in Footnote 7, while the Court illuminated the space between the concepts of "store" and "produce," it also recognized that "Congress may have employed a belt and suspenders approach in writing the statute." *Id.* (internal quotation marks and citation omitted).

Nothing in the opinion suggests that the Court intended to define an autodialer to include the generation of any random or sequential number. Indeed, the amicus brief by PACE cited by the Court disproves Borden's reading: the "numbers from a preproduced list" mentioned by PACE were themselves randomly or sequentially generated telephone numbers. PACE *Duguid* Br. 19. This differentiates the PACE amicus brief's example from the preproduced list of phone numbers used by eFinancial in which the telephone numbers were provided by customers. And it suggests that the Court, in writing Footnote 7, just like the drafters of the TCPA, used the common shorthand "numbers" to mean "telephone numbers."

## CONCLUSION

While we all wish for fewer calls and messages from marketers, we are limited to the bounds of the TCPA. We **AFFIRM.**